[PHILADELPHIA, JANUARY 16, 1841.]

## THE SCHUYLKILL NAVIGATION CO. *against* FREEDLEY.

### IN ERROR.

In proceedings to estimate the injury sustained by the owner of a mill from a dam raised by the Schuylkill Navigation Co., it was *held* that the jury were to ascertain what was the real damage to the mill in ordinary events, and were not to be governed by the consideration of the profits which the owner might have derived from an accidental rise of the value of grain at the particular time.

ERROR to the Court of Common Pleas for the county of Montgomery, to remove the record of certain proceedings, instituted by Jacob Freedley against the President, Managers, and Company of the Schuylkill Navigation Company, to obtain damages under the tenth and eleventh sections of the act of Assembly, passed on the 8th of March, 1815, entitled "An act to authorise the governor to incorporate a company to make a lock navigation on the river Schuylkill," and the several supplements thereto.

The proceedings were commenced by a petition which was filed on the 18th of November, 1839, and set forth that the "petitioner was, at the time of the grievance and injury hereinafter mentioned, and still is, owner of a certain tract of land, situate in the borough of Norristown in said county, bounded by lands late of Mathew Chain, deceased, lands of John Boyer and others, containing about fifty acres more or less, on which was erected a certain flouring and grist mill, and other water-works, which were propelled by the waters of a certain stream called "Stoney Creek," which passes through said premises and empties into the river Schuylkill; and that the President, Managers, and Company of the Schuylkill Navigation Company have erected a dam in said river, opposite to said borough of Norristown, and below where the said Stoney creek empties into said river, which dam the said President, Managers, and Company have recently, and while your petitioner was owner of the said

(Schuylkill Navigation Co. *v.* Freedley.)

premises, caused to be raised fifteen inches higher; which erection and raising of said dam, has caused the water of the said river and creek to swell upon the lands, mill and other water-works·of your petitioner, so that about one acre of the above-mentioned tract of land has been inundated; and the water power, flouring and grist mills, and other water-works of your petitioner on said premises, are much injured by reason of the swelling of the water in and upon the tail race and water wheels of the same. Your petitioner further represents, that the said President, Managers, and Company, and your petitioner, cannot agree on the compensation to be paid by the said company for said injury, nor upon the appointment of suitable persons to ascertain the same. He therefore prays your honors to award a *venire*, directed to the sheriff of the said county, to summon a jury of disinterested men in order to ascertain and report to your honors what damages have been sustained by him by reason of the erection and raising of the dam aforesaid, agreeably to the provisions of the act of Assembly, passed the 8th day of March, A. D. 1815, entitled 'An act to authorise the governor to incorporate a company to make a lock navigation on the river Schulkill,' and the several supplements thereto."

Issue was joined on the allegations in the petition, and the cause came on before a jury of Montgomery county, on the 30th of May, 1840, when a verdict was found for the plaintiff for $975, from which he appealed.

The defendants having obtained an order for a charge of *venue*, the cause came on before a jury of the county of Bucks on the 26th of October, 1840, when a verdict was found for the plaintiff for $5814, upon which judgment was entered; and this writ of error was taken.

The evidence given on this trial, so far as it is material to the understanding of the points discussed in this court, is sufficiently stated in the charge of the court below, (Fox, President) which was in substance as follows :

"This action depends upon the 10th section of the act of Assembly, incorporating the Schuylkill Navigation Company. The questions in the case, mainly, are, how great was the inundation caused by the defendants' dam on the land and mill of the plaintiff? and what damage was suffered by the plaintiff thereby ? Is the water backed by the dam on to Freedley, and to what extent? This the jury is to decide from the evidence, which is of various descriptions. There is direct evidence that, since the erection of the new dam, the water is swelled, three miles up the river, ten inches higher than it was previously. If this is to be relied on, then it will govern this part of the case, for the question is not what the height of the dam erected

(Schuylkill Navigation Co. v. Freedley.)

may be, but what effect the dam has had to inundate the plaintiff's property. In considering this question, the jury must take the whole evidence. Immediately before the erection of this dam, it seems that the old one was in a very bad state. The water leaked through it to a very great extent, and there were deep depressions in its' top, in consequence of its being undermined, which carried off a large portion of the water. Now if this were the original state of the dam, when the damages were assessed to the Bank of Montgomery County, then the rise in the river, created by the erection of the new dam, be it what it may, is that much greater than the company have ever paid for. But if the old dam were even at the top, and tight, backing the water eighteen inches on the bank, and the difference in height between the two dams is only four and a-half inches, then it will follow that Freedley is entitled to damages only for an inundation of four and a-half inches. I repeat, that an important question is, how high was the water backed by the old dam on the bank? It is of no consequence how high the dam was raised; if it did not back the water on the party above, he had no cause of complaint in such case, and could recover nothing. But if the dam was altered, even if not raised, so as to back water on those above, then their right to compensation accrued. If the water was drawn off from the pool above by leakage or otherwise, so as not to inundate those above, no damage was done to them. If those leaks were stopped, and there was a consequent inundation, then the right to be indemnified ensued. Then, when the old dam was raised eighteen inches, and the Bank of Montgomery·County was compensated, what was the backwater from the old dam upon the land now of Freedley? How much more does it back now than it did then? There is a want of evidence to show the precise state of the old dam, immediately after it was raised the eighteen inches. That it was seriously injured sometime after it was built, is certain; but we have no precise evidence as to the quantity of water which escaped through or over parts of it at the time of its erection—we must get at this as well as we can. When a dam is built, the presumption, perhaps, is fair, that it was intended to be water-tight. But you may take all the circumstances into consideration—the state of the river—the material of which the dam was composed—the manner of its construction, &c., to ascertain how great the inundation was above, at the time the dam was raised eighteen inches. What evidence have we of the comparative height of the two dams, and the height to which the water was swelled upon Freedley?

1. We have the measurement made of the dams themselves. Two witnesses swear that they measured from what they believe to be the top of a part of the old dam to the top of the new dam, and that the new dam is but four and a-half inches higher than the old. The weight of this evidence is for the jury.

2. We have the measurement of the loss of head.—Mr. Knaus says there is, by actual measurement, a loss of head of six inches.

Larer estimates the loss of power by the swelling of the water by the new dam at about one-third of the whole power. Charles Axe and Christopher Heebner give evidence very much to the same purpose.

3. The actual state of the water upon the rock below the sheeting of Freedley's mill, at present and before the new dam was built.

Then if the jury determine that the land of the plaintiff is inundated by the erection of the new dam, what is the damage suffered by the plaintiff?

The claim set up is as follows:

1. For the permanent damage of the property, the plaintiff is entitled to be made whole. The defendant, by law, may inundate the plaintiff's land, but, if he does so, the plaintiff is not to be the loser, nor is he to make a speculation out of it. Then what will make him whole in this particular? What is the value of what he has lost? Whatever it is he is entitled to a verdict for—and no more.

2. The plaintiff alleges that, at the particular time when the new dam was raised, he had on hand a quantity of rye, from the grinding and sale of which he would have made a certain sum, had the dam not been raised, but which he lost in consequence of the backing of the water on him. If the jury are satisfied of the fact, they should compensate the plaintiff for the loss thus sustained.

3. The plaintiff also claims the amount of expenses which he necessarily incurred in altering his mill, in consequence of the backwater. This is also a good ground for claim, if the jury believe the facts made out by the evidence, and have not included it in their estimate of permanent damage.

Having estimated the injury, if any, which the plaintiff has sustained, the jury will then examine whether the plaintiff has derived any advantage from the erection of the dam; if his property is benefitted by the improved navigation; if he can get boats to his mill with greater facility than he did before, you must estimate the value of such advantages, and deduct it from the amount of injury. But it is averred by the defendant that the dam was erected at the request of the plaintiff—that it would not have been done but for this request and agreement of the plaintiff. If this were proved, the plaintiff could not recover, be his loss what it might. If he requested it to be done, and it was done, he could have no right to complain. But what is the evidence? Michael Towers says, while he was at work at the dam, Jacob Freedley expressed to him a wish that the dam might be raised from four to six inches; that it would help him to get into his mill with boats. Witness thinks this was at the dam. Holloway says—in 1836; when they were building the dam, Freedley frequently asked him whether the company considered how much

higher they would raise it than the old one. He said he would like they would raise it six inches higher than the old dam, in order to enable him to get up to his mill with loaded boats. He said six inches would be a great accommodation to him in getting up with his boats and not injure him otherwise. He said, at the same time, he would not like it to be raised more than six inches. Now there is no evidence that this was ever mentioned to the company, or that they ever knew of it, or acted at all in consequence of it. Such being the case, it cannot be considered as an agreement, nor in any respect as a bar to the plaintiff's action. But if it be true, it is evidence for the purpose of showing what idea the plaintiff himself had of the damages that would be done him by a rise of six inches on the dam. If the plaintiff did thus frequently express himself, certainly it is of considerable importance in the case, but only in the point of view in which I have put it, that is, to show the estimate which the plaintiff made of the damage which would be done or the advantage which would arise to him from the erection of the dam."

The following errors were assigned.

" 1. The court below (after charging the jury that the plaintiff was entitled to be made whole for the permanent damage done to his property) erred in charging the said jury as follows. ' 2. The plaintiff alleges that at the particular time when the new dam was raised, he had on hand a quantity of rye, from the grinding and sale of which he would have made a certain sum, had the dam not been raised; but which he lost in consequence of the backing of the water on him. If the jury are satisfied of this fact, they should compensate the plaintiff for the loss thus sustained.'

2. The said court erred in charging the jury as follows. ' 3. The plaintiff also claims the amount of expenses he necessarily incurred in altering the mill, in consequence of the back-water. This is also a good ground of claim if the jury believe the facts made out by the evidence, and have not included it in their estimate of permanent damages.' "

Mr. *Tilghman,* for the plaintiffs in error, cited *The Schuylkill Navigation Co.* v. *Thoburn,* (7 *Serg. & Rawle,* 411.) *Shrunk* v. *The Schuylkill Navigation Co.,* (14 *Serg. & Rawle,* 71.)

Mr. *Freedley* and Mr. *Meredith* contra, cited *Caruthers* v. *Dunning,* (3 *Serg. & Rawle,* 373.) *Oliphant* v. *Smith,* (3 *Penn. Rep.* 180.) *Creswell* v. *Clugh,* (3 *Watts,* 330.) *Lehigh Bridge Co.* v. *Lehigh Coal Co.,* (4 *Rawle,* 23.) *Sauerman* v. *Weckerly,* (17 *Serg. & Rawle,* 116.) *Scott* v. *Sheakly,* (3 *Watts,* 50.)

The opinion of the court was delivered by

Huston, J.—I have been so much struck by some things appearing in this case that I will mention them, though not the reason on which our decision must be made.

In January, 1832, on proceedings to recover damages occasioned by a former dam, the company paid $800, the sum at which the damages were appraised. No person has stated to what point at the complainants mill this dam raised the water. Either it was badly constructed or it was somehow injured, for it is in proof that it leaked in a year or two from one end to the other; and in 1834 or 1835 it sunk about the middle from eighteen inches to two feet; so that in 1836 it became necessary to build a new dam. Witnesses who saw it while it was leaking, or when sunk, tell us that the water was ten inches, or, as some say a foot, and others fourteen and fifteen inches below its present height. Now as the company paid for all damages done by it when not leaking and not sunk, they are only liable for any damage done by raising the present dam higher than the former as it stood when first erected; and the old dam might have been repaired so as to be of an uniform height, and so as not to leak and no damage to Mr. Freedley—damages to that height had been paid for. This would have raised the water above where it stood in the dilapidated state of the dam, and would have brought it to within five inches of its present state; for the proof seems full, and certain, and indisputable, that the present dam is not five inches higher than the former one. And it seems to me strange that any weight should be allowed to conjectural opinions in opposition to actual measurement. It is not forgotten that in 1836 the winter crops in much of this state, and in some other states, failed in a manner, to occasion much distress, and to raise very much the price of wheat and rye : if not sworn to I would not have believed that the scarcity was so great as to enable a man to sell rye bran at a dollar per bushel. Mr. Freedley is stated to have purchased a quantity of rye from men in Huntingdon and Mifflin counties, at from $1,25 to $1,31 per bushel, and that in the spring of 1837 he was making great gain by selling rye meal at $2,00 per hundred pounds, and bran of rye as above stated : and the court say, " It is alleged that at the particular time when the new dam was raised, he had on hand a quantity of rye, from the grinding and sale of which he would have made a certain sum, had the dam not been raised, but which he lost in consequence of the backing of the water on him : if the jury are satisfied of the fact, they should compensate the plaintiff for the loss thus sustained." This part of the opinion is alleged to be error, and we think not without cause.

Without recollecting that unless ruinous dams are repaired, the produce of Hollidaysburg and Mifflin will not come to this market ; for the land carriage will be equal to the price ; and without noticing

that if the dam, and during 1837 the coffer-dam, had not been there, Mr. Freedley could not have sent his meal to market by the canal below; there are other considerations which forbid the allowance for the item of damages here claimed and allowed. Whatever is a great benefit to a large portion of the community, results, though not so immediately, in a benefit to the whole community; and if in the attainment of this general good, some little inconvenience is sustained by some persons, this is not the subject of action, nor does it entitle to damages. Houses are burnt down, or fall down, or become ruinous, and are to be rebuilt. The stone, and brick, and lime, and mortar, and the carriages, and drays, and workmen, occasion considerable obstruction in the street, and some annoyances to those living adjacent, yet it would not do to subject the owner to a suit because some one had purchased a fresh supply of goods, and alleged that men, and especially ladies, would not come to buy, and therefore he had lost the profits he expected. The loss alleged is the profits on a speculation in rye; but the company are not liable for such losses. Mr. Freedley knew they had begun to rebuild the dam, and were bound by their duty to the stockholders and to the community to go on and complete it. Neither the objects for which the company were incorporated, nor their duty, nor common sense, required that all the navigation should continue interrupted and suspended because one person had made a speculation in grain.

It was long ago settled in this court that the company were not liable for speculative damages, or profits which any person supposes he might have made if no canal had been constructed. (Commonwealth v. Thoburn, (7 Serg. & Rawle, 411.)

On the principle adopted in this case, suits might be brought, if the navigation was at any time interrupted, and men would allege that produce fell, and so they sustained loss; and this loss would depend on the state of the market. But this is not all. There would be no means of ascertaining the amount of the loss, or the real cause of it. I know one man who would not sell his wheat that year because he could not get more than two dollars a bushel for it; and next year be got one dollar. Mr. Freedley's profits ceased, in part at least, about the first of July, when rye and wheat ripened; and yet his witnesses, and I am afraid the jury, carried it on to December.

The matter, and the only matter to be decided, is, what was the real damage to that mill in ordinary events by raising the water as it was raised by that dam; and not how much of Mr. Freedley's profits, from an accidental rise in the price of rye, accrued at that time. And, in order to ascertain this, the jury must ascertain how much it was raised. If only raised five inches or less, there is an end of calculations about loosing a foot or fifteen inches.

His mill is an overshot; he uses the same wheel, and although it

(Schuylkill Navigation Co. *v.* Freedley.)

is wholly raised seven inches, yet the water comes into the top buckets as it did before. He had then lost no power; for only ignorant people talk about water in a breast or overshot producing any effect except by its weight.

As to the request by Freedley to the contractor to raise the dam; I think the matter requires a more precise statement. Was the dam by the directions of the company to be raised to a certain height? Was it raised above that height? and if so, did the contractor add to its height at the request of Mr. Freedley? If so, is the company liable although the contractor never told them of Freedley's request, or that he had complied with it? If built according to the plan of the engineer, and the directions of the company, it seems not material what Mr. Freedley wished or said; but if it was raised in consequence of his request, it would seem not material whether it was so raised by the contractor with or without the direction of the company.

Judgment reversed and *venire de novo* awarded,