MIDDLE DISTRICT, HARRISBURG, 1854.

1 G   123
30 SC ²131

## Malaun's *Adm'r versus* Ammon *et ux.*

1. The Statute of Frauds and Perjuries prevents the acquisition of interests or estates in lands by parol contracts, but does not prohibit either party from recovering damages for their breach.

2. Where one party contracts to labor, and the other to pay for the services in property designated, the measure of damages for breach of the contract is the value of the property contracted for at the time when it ought to have been conveyed or delivered.

3. It makes not the slightest difference whether the wages were to be paid for in land or in personal property. In either case, if the party refuses to pay in the property agreed upon, nothing short of its value will be an adequate compensation for the injury.

4. Where the question was whether a decedent made a parol sale of her estate, her dying declarations were properly submitted to the jury as evidence of such a contract.

5. In an action against an administrator, his wife is not a competent witness for him.

ERROR to the Common Pleas of *Adams county.*

Argued and decided in the Supreme Court at Harrisburg, at the June Term, of 1854.

The plaintiffs below, now defendants in error, sued the administrator of Rebecca Malaun, deceased, in trespass on the case, and declared in four counts: 1st, On the alleged promise of the defendant's intestate, Rebecca Malaun, that she would, at her decease, leave to the said Betsy, all the property and estate that she should be the owner of, at the time of her death: 2d, On the alleged promise of said Rebecca Malaun, that she would in, and by her last will and testament, devise and bequeath to her (said Elizabeth) all the property and estate of which she (Rebecca) should be the owner, at the time of her death: 3d, On the alleged promise of said Rebecca, that she would convey and transfer to her (Betsy) all the property and estate that she (Rebecca) should be the owner of at the time of her death: 4th, An "*indebitatus assumpsit*" count for work, labor, care, diligence and attendance as a servant, housekeeper and nurse. The consideration laid in the 1st, 2d, and 3d counts, was, that the said Betsy (being sole) at said Rebecca's request undertook, and faithfully promised the said Rebecca, that she (Betsy) would live with, labor for, and take care of and nurse the said Rebecca, from that time forward, to wit: 10th May, 1846, so long as she the said Rebecca should live. The narr. concluded to the damage of said plaintiffs of $2500.

[Malaun's Administrator *v.* Ammon et ux.]

The defendant pleaded *non assumpsit, non assumpsit infra sex annos,* payment with leave and set-off.

The plaintiffs sought to recover the whole estate of Rebecca Malaun, (laid at the value of $2500,) and appropriate it to said Betsy, on an alleged parol promise of said Rebecca. They gave the following evidence:

*Jacob Fullweiler,* affirmed.—I am the brother of Elizabeth Ammon; she came to Malaun's when she was seven or eight years of age; Benjamin and John, and Rebecca and Sally lived in the family; they were brothers and sisters; they then lived on a large farm; then afterwards the family moved to a house and lot; they lived in this house two years or more; then Benjamin died; a few years after Sally died; John and Becky remained together a few years; then they two concluded to make a divide of the estate; they made a divide; they remained together till that time; after that, then he left and went upon his farm; my sister (the plaintiff) remained with Rebecca; I came to Rebecca's house after the division was made; after I came, Becky told me how the affairs had went.

Betsy told Rebecca, if she wanted to live with John that she would find another place for herself; Rebecca then said, "no, you must stay with me and take care of me while I live; you know I cannot live with John; after my death you shall have all I leave;" Betsy consented that she would stay; this was seven or eight years before her death; she died in the winter of 1852.

In the fall of 1851, I visited them; then I staid over night; in the evening at supper, while we were sitting at the table taking tea, Becky told me Betsy had a notion to get married; I told her I thought Betsy was not so foolish as to get married, and that she would not leave her; Becky then said, "no, she is not to get married, she is to stay and live with me and take care of me while I live, then after my death she is to have all I leave;" Betsy did live with Rebecca until she died; Rebecca urged on the marriage all she could; she said they had no man about; Rebecca and all lived together after the marriage of Betsy to Ammon; I visited them often, once or twice a year; Rebecca always came over the conversations I have mentioned.

At one time Rebecca said, "I have told several others, and I now tell you, so that if any thing happens, you may testify to the truth." Betsy is thirty-eight or thirty-nine years of age.

*Cross-examined.*—I was twelve or fourteen when Betsy went to Malaun's; we then lived at the Branch Creek; * * never called on any one to try to have it settled; never called on John Roland to try to have it settled; I never tried to prove what Rebecca said to me as a will; I went with them to Evans's; Benjamin went there to administer on the estate; I did not tell Evans and Mayer what I say now, nor did I say what I told here, that Rebecca

said it must stand as a will; when Evans said it would not stand, I did not say it must and should stand as a will; I was examined before arbitrators in this case; I never told anybody that Betsy was cunning and planning, and I would help her all I could; I told Mrs. Benjamin Malaun I thought a verbal will as good as a written one, but I did not say anything about Betsy's planning; I went to John and we talked about this affair, and I said we ought to settle it. (Counsel for defendant, reading from notes at arbitration, as to first conversation.) This you read is not all I said when examined as a witness before the arbitrators. (Counsel reading from notes as to second conversation.) This you read now, is about what I testified to in the fall of 1851, and about all she told me; I said before the arbitrators what Rebecca said about my proving it.

*Agnes Sarbaugh*, sworn.—I lived about a mile from Rebecca's; Betsy was there from the time she was seven years old till the time Rebecca died; she told me once when Betsy and her husband had gone to pay a visit, that it was understood that if Betsy staid with her until she, Rebecca died, Betsy was to have all she had; it rained, and it was the last of January; on the 11th of February she told me the same, and that if she died, Betsy was to have all; she told me Betsy was a good girl to work, and she worked out; I often heard Becky say Betsy was a good girl; I once heard her tell Betsy, the more she saved the more she would get; Betsy was a sickly woman; she had pains in her breast; Betsy did sewing for the neighbors; for John Roland; I saw Becky bring in wood; Betsy dressed as well as became her business.

*Abner H. Binder*, sworn.—I was at Rebecca's house; I was the assessor; after I took her property, I asked her if Betsy had any money at interest; Becky told me she had none, that she had been living with her, and had no way of making money, and did not expect she would have any until her death, as she was to have then what she left; I then was satisfied; this was all that was said; this was about seven years ago.

*Philip Kimmell*, affirmed.—I was a near neighbor to where Becky lived; twenty years I lived so near that they could hear by a loud call; I was there often; I farmed a lot for them six years; she was industrious as far as I know; was a good girl as far as I know; Rebecca was a weakly woman, old, and was able to be about; she was over seventy years of age; the fall before she died, she said that Betsy was a good girl; this, I think, was before she was married; she said she was to live with her, and after her death she was to have all she, Rebecca, had.

*Cross-examined.*—John Malaun and I have not been good friends; I said John was savage against me, and that I was savage at him, and he was savage towards me; I do not step here

[Malaun's Administrator *v.* Ammon et ux.]

for passion; this is the second time I was ever examined as a witness; I never told Emanuel Rhinehart that I knew nothing about this case; I never said so in the presence of my wife.

*John Maul,* examined.—On the 16th February, 1852, I heard Rebecca Malaun was sick; I went to see how she was; she appeared to be very sick; about midnight, some of them went to bed; they were in bed but a short time; I said they should waken them; said this to Betsy *Fullweiler;* I thought she would die; she then commenced to talk with me; I could not understand what she said; she was sitting on the bed; she then got out on the chair; some one helped her; then she said something; I don't know what,—" after I'm dead," or something like that; then she said, "I wish Betsy to have the house and lot, and all that is left." Then I said, "what do you mean by what is left? Do you mean house and kitchen furniture?" she said " yes, house and kitchen furniture, and all that is left." I said in her presence, "I do not think this will do;" it was between 12 and 2, A. M., of the 17th; she died the 18th; I said I did not believe this would do; if she lived till morning they ought to send for two men; Mrs. Ross was present; plaintiff and his wife present; when I said this, no one answered.

*Cross-examined.*—Plaintiff nor his wife never said anything to me about a contract.

*Peter Deardorff,* sworn and examined, and his testimony given under exception by defendant.—I was there on the 17th; she said, I give Betsy the sheep, and the cow, and the hogs and the house, and the lot, and what these two men reserved to me; she said, it is but little; I had to make shift, and so she must too; all my furniture, and all my money shall Betsy have, after my death; we then bid her good-bye, and she said help her (Betsy) all that you can; I was not often there; I sold them wheat and wood, Betsy bought it and paid me for it.

*Cross-examined.*—I came when I got this letter; (letter marked A); I came to Rebecca Malaun's the time I speak of; Ammon and wife were there; when all the people went off home, Betsy said Rebecca wanted to see us; she did not show us into the room, we went in; Rebecca said she was very sick, and then stated what I have said; Diehl went in also; Elizabeth was in there then; she gave no directions about putting it in writing; the letter A, is in handwriting of Ammon; after Diehl came back Rebecca said nothing. Letter A read.

" Mr. Peter Deardorff, Rebecca Malaun wishes to see you very badly, and bring George Diehl along with you; you to come as soon as you possibly can."

Above letter admitted by plaintiffs' counsel to have been written by Harmon Ammon.

[Malaun's Administrator *v.* Ammon et ux.]

*George Diehl,* sworn and examined under exception by defendant.—On 17th February, 1852, Mr. Deardorff called, and showed me (letter A) these few lines; several persons were in Rebecca's room when we went there; after they had left we went into Becky's room; then she commenced with these words; "I give Betsy the cow, the sheep what is here, the hogs what is here, the house and the lot, and all that these two men reserved to me;" I then went into another room; when I came back I asked her what she meant by the things the men reserved for me; she told Betsy to go to her chest and get the papers, and she gave them to me; I then bid her good-bye; she held out her hand and said I should see that Betsy should get these things; these are the papers (B and C,) as near as I can judge.

*Cross-examined.*—Deardorff asked me if I had put it down in writing, what she said; I said no, I would not, except I wrote it as a will; that I am not capable to do.

Deed of Release, John Malaun to Rebecca Malaun, for house and lot, and inventory of Rebecca's personal estate, taken 6th March, 1852, amounting to $1193.37, were put in evidence.

*Defendant's Evidence.*—*John L. Roland,* affirmed.—I was raised in the family of the Malaun's; for 35 years I was in it; the farm was one-quarter of a mile from the lot; they left the farm in 1820; I left the farm in 1846, and moved to East Berlin in this county; Elizabeth came when she was 7, 8, or 9 years old; I then lived in the family; her mother was living on a branch of the Bermudian creek; her father had left the country; I did not see him in that neighborhood; she, after leaving Bermudian, lived about; the boys were put to trades; when free, were at home keeping house with their mother, at Dr. Blish's house near Hampton; sometimes Betsy lived with the Malaun's, then with her mother; mother and daughters after that lived with Malaun's; Betsy was dressed as well as any in the neighborhood; Malaun's sent her to school; in 1820, they went to the house to live, and left the farm; all lived together till sister and brother died; after that, John and Becky and this girl lived together until they got to loggerheads and parted; John went to the farm and Rebecca and Betsy to the house; after John and his sister parted Betsy kept the purse; Betsy said, go he should, when the men wanted John to stay; go, she said, he must, and go he did; Betsy ordered him not to stay another night; this was the night of the divide; after the divide things went on as usual; she was old; Elizabeth had a horse to ride whenever she wanted to; I borrowed $100 and paid it to Betsy; Fullweiller called on me after the death of Becky to go to Betsy and John to have things settled; he staid all night and insisted upon me going; I said I would not; it was Jacob Fullweiller, the witness; she was doting; she was 77 years of age; from the time I left the property her

mind was getting weaker; she told me she was so forgetful that she was not fit to do business; she could be coaxed to do any thing; at least Becky would buy or sell nothing without consent of Betsy; when Betsy ordered John to leave the house, Becky said nothing that I know of; I hired girls at from $2 to $2.50 per month; they found their clothing; I would not like to give much for Betsy's services and find her clothing. The way women now dress, I would not clothe them for their labor.

*Cross-examined.*—I think about 70 or 75 the mind becomes weak.

*George Mundorff*, affirmed.—When the administrator and appraisers were there, Betsy Ammon would show them, and pointed out such property as she chose to return to administrator, saying at the same time that the reserved property belonged to her; the administrator told her he did not want any property she claimed as her own, only what belonged to Malaun; she claimed property worth $300; more things left in the house than were sold; girls got $2 to $2.50 per month.

*Peter Blaizer*, sworn.—I was raised about one half mile from Malaun's; Betsy came about twenty-one or twenty-five years ago; she had no means; her parents had no means; Betsy said he (John) should not stay; he went before night; went just after we were done; Betsy received the money that I paid on a note I owed to Becky.

*Jacob Kochenour*, sworn.—Betsy said that John should not stay over night, when we made the division; Becky did not object, but Betsy said he should go that night; wages of girls there, 50 to 62½ cents per week.

*Barnett Hildebrand*, sworn.—In the spring of 1850 and 1851, I paid to Betsy Ammon $70, money obtained from Becky Malaun.

*Emanuel Rhinehart*, sworn.—I lived with John Malaun three years ago last spring; often passed Becky's, and been in the house; saw Becky wash and carry in wood; once washing alone; Betsy was sickly all the time—doctored sometimes.

Mr. Kimmell and Kimmell's wife and myself were together; Kimmell's wife said they need not subpœna her, she knew nothing; he said, nor I either; I saw John, five years ago, at Becky's, when Sarbaugh died there; Becky had girls there hired to do work.

*David Deardorff*, affirmed.—I got money from Betsy Ammon; I asked Mr. Ammon for the loan of $300; he promised it to me; when I was there he was not at home; he said his wife would give me $100; she did so; he gave me the rest two years this spring now coming in—spring of 1852; girls wages $3 to $3.50 on farms.

[Malaun's Administrator *v.* Ammon et ux.]

*Elizabeth Malaun,* affirmed on voire dire.—Mr. Benjamin Malaun is my husband; defendant in this suit.

Elizabeth Malaun was offered, to contradict Jacob Fulweiler, and prove a conversation with him which he denied having with her.

Evidence rejected by court.

*David McConaughy,* sworn.—I was present at the arbitration, and carefully took down the words which Fulweiler stated were spoken by Rebecca in the first and second conversations. The words are as follows: "By no means, said Rebecca; I can't live with John; you must stay with me while I live, and when I die you shall have what is left." In the second conversation I said: "No, I hope she was not so foolish;" "No," she said, "she can't leave me, she is to live with me, and after I am dead she is to have all I leave."

*Plaintiffs' Point.*—The court is respectfully requested, by plaintiffs' counsel, to charge the jury:

That if, from all the evidence in the case, they are satisfied that a contract was made between Rebecca Malaun and Elizabeth Fulweiler, (now Ammon,) by which the said Elizabeth was to live with and take care of the said Rebecca, so long as she, the said Rebecca, should live; for which she was to have, at the death of the said Rebecca, all her property or estate, or all that she should leave, and that the said Elizabeth, in pursuance of the said contract, did live with and take care of the said Rebecca, until her death, faithfully fulfilling said contract, on her part, and the said Rebecca failed to perform said contract, on her part—by reason whereof, the said Elizabeth did not receive said property or estate, nor any part thereof, at the death of the said Rebecca, nor since that time; the plaintiffs are entitled to recover as much as the said property or estate of the said Rebecca, at the time of her decease, was worth.

The court answered this point in the affirmative.

*Defendant's Points.*—The court is respectfully requested to charge the jury—

1. That the evidence given in the cause, does not support either one of the first three counts in the declaration. The *allegata* and *probata* do not correspond, and on them, or either of them, the plaintiffs cannot recover.

2. The fourth count is general; and upon it the plaintiffs can only recover the value of Elizabeth's services to Rebecca Malaun, and if for these she has been fully paid, by articles kept by her, and money paid to her, then the plaintiffs cannot recover.

*Charge of the Court.*—The court stated to the jury the substance of the four counts in plaintiffs' declaration, and said: "The plaintiffs cannot recover under any of the first three counts, unless they have proved the cause of action in substance as laid

in at least one of them; or, in other words, a special contract as laid."

The court then read to the jury the evidence upon which the plaintiffs rely to prove a special contract, and said upon this evidence they predicate the following point: (court then read plaintiffs' point and said)—this point the court answer in the affirmative; but in so answering it, do not assert that the facts are as stated in it, or that the testimony of the witnesses is true. It is for the jury to ascertain what the facts are, and also whether the testimony of the witnesses is to be credited. If the jury decide from the evidence that there was such a contract as is supposed in the point, and that Betsy Fulweiler fulfilled her part of it, then the plaintiffs are entitled to recover; and the measure of damages is. the value of property or estate Miss Malaun agreed to give Betsy Fulweiler, whether it be her real or personal estate, or both, or any part of either.

Upon the first three counts the defendant has also asked the court to charge the jury. (The court here read defendant's first point, and said)—The court cannot answer this point in the affirmative, but tell the jury that, if the evidence proves to their satisfaction that Rebecca Malaun promised in substance " to leave to," or " to devise and bequeath to," or " to convey and transfer to " Betsy Fulweiler all the property said Rebecca should have at the time of her decease, on condition that said Betsy would live with Rebecca during her life, and take care of her, and that Betsy did so live with her, then the plaintiffs can recover in this case, the value of the real and personal estate left by the said Rebecca at the time of her decease; the exact words laid in the declaration need not be proved; it is sufficient if they be proved in substance.

The court then read the defendant's second point and answered it in the affirmative and said:—Upon the fourth count in the declaration, already explained to you, this point is predicated, and under it the plaintiffs are entitled to recover for any work done by Betsy Fulweiler for Miss Malaun, what it was reasonably worth, if she has not been paid for it, or received as much money belonging to Miss Malaun as amounted to its value. But the jury can find for the plaintiffs on this count on the supposition only, that no express contract was proved, and even then they cannot find for all the services rendered, but for that portion which was rendered within six years from the time this suit was brought; all. beyond that time is barred by the Statute of Limitations, which is pleaded in this case.

Verdict and judgment for plaintiffs, for $1843.47.

It was assigned for error, among other things, that the court erred in answering plaintiffs' point in the affirmative, and in rejecting the testimony of the administrator's wife.

[Malaun's Administrator *v.* Ammon et ux.]

*Hepburn* and *McConaughy*, argued for plaintiff in error, and cited as to the right of action and the measure of damages, *Bash* v. *Bash*, 9 Barr, 260; *Defrance* v. *Austin*, 9 Barr, 309; *Luntz* v. *Frey*, 7 W. 366; *Eckert* v. *Eckert*, 3 Penna. R. 332; *Wood* v. *Farmere*, 10 W. 204; *M'Clure* v. *M'Clure*, 1 Barr, 374; *Blakeslee* v. *Blakeslee*, Am. Law Register, vol. 2, No. 3, p. 188.

As to the competency of Mrs. Malaun, they cited 16 S. & R. 193; *Keifer* v. *Branneman*, 1 Barr, 452; *Goodtitle* v. *Welford*, Douglass, R. 139; *Richardson* v. *Leamer*, 10 Pickering, 261.

*Durkee* and *Chapin*, contra, cited many of the same authorities, and *Logan* v. *M'Ginnis*, 2 Jones, 27; *Jack* v. *M'Kee*, 9 Barr, 235.

The opinion of the court was delivered by

LEWIS, J.—If any thing can be regarded as settled, it must be taken to be fully established as the law of Pennsylvania, that while the Statute of Frauds and Perjuries prevents the acquisition of *interests* or *estates* in lands by parol contracts, it does not prohibit either party from recovering damages for their breach. The action for damages is, to all intents and purposes, a personal action, and, like any other action of that kind, may be supported by parol evidence. In such cases the measure of damages is as well settled as the right to recover them. Where one party contracts to labor, and the other to pay for the services in property designated, the measure of damages is the value of the property contracted for at the time when it ought to have been conveyed or delivered. In principle, it makes not the slightest difference whether the wages were to be paid in land or in personal property. In either case, if the party refuses to pay, in the property agreed upon, nothing short of its value would be an adequate compensation for the injury. Any thing less would enable the defendant to profit by his own wrongful breach of contract. After the early decisions in 4 Dallas, 152, and 1 Bin. 450; and the more recent cases of *Bash* v. *Bash*, 9 Barr, 260; *Jack* v. *M'Kee*, 9 Barr, 235; *Meyers, Adm'r*, v. *Oyer*, decided in July, 1853, and *Beach* v. *M'Clintock*, decided in May, 1854, it would be a waste of words to discuss the question further. The evidence offered by the plaintiffs below, as stated in the first assignment of error, although not sufficient of itself to establish a contract, tended to corroborate the testimony which had previously been given. It was therefore properly submitted to the jury. The dying wish of the decedent, that the plaintiff should have the property embraced in the contract, was also properly left to the jury. It was for them to consider whether it was merely the expression of a wish to make a will in favor of one who had no legal claims upon the decedent, or the honest desire that her solemn contract should be fulfilled. If the plaintiff agreed to live with the decedent, and

to take care of her while she lived, in consideration of the express promise of the latter to compensate for these services, by giving all that the decedent left at her death, such an engagement, especially after the services have been fully performed by seven years' labor, is a contract which is binding in morals and in law. It is a misapplication of terms to call such a transaction a will.

The 2d, 3d, and 4th assignments of error, have been considered in what has already been said. They are not sustained. The 5th is imperfectly assigned. The bill of exceptions on which it is founded is not set forth according to the rule of court.

The 6th assignment relates to the rejection of the defendant's wife as a witness in his favor. It is not necessary, at present, to consider whether an administrator is personally liable for the costs of an action which he has defended in good faith. It seems to be settled, as a general rule, that a party to the record cannot be a witness in his own favor, whether he is personally interested in the result or not. Although an administrator may have no personal interest in a suit in which he is a party on the record, he is nevertheless an incompetent witness. If the husband is excluded from testifying, upon principles of policy, the wife stands in the same predicament. Husband and wife are so far identical in interest and feeling, that where one is a party to the record, the other is not a competent witness. We see no error in this record.

Judgment affirmed.

LOWRIE, J., and WOODWARD, J., dissented, the latter of whom filed the following opinion.

WOODWARD, J.—It was in the year of our Lord one thousand eight hundred and forty-eight, that the cases of *Jack* v. *M'Kee*, 9 Barr, 235 ; and *Bash* v. *Bash*, Ib. 260, were decided in the Supreme Court of Pennsylvania. Both these cases came up from Westmoreland county, and were reviewed and decided here at the same term. Conceiving that a very dangerous doctrine was, for the first time, advanced in these cases, on the measure of damages for breach of parol contracts for the sale of lands, which has already led to cases of monstrous hardship, and is liable to do much more mischief, I propose first to state the point ruled in these cases, then to examine it in the light of reason and authority, and then to point out its fruits in subsequent cases, this one now before us among others.

The pleadings in *Jack* v. *M'Kee*, are not given in the report of the case, but it appears to have been an action on the case by Miss Ann M'Kee against the executor of Matthew Jack on a contract, that in consideration of the plaintiff continuing to live with him, and take care of his house till he died, he would give her a certain piece of land. The contract was left in parol, and

depended, so far as the land was concerned, on the uncorroborated testimony of a single female witness. Unconscious of any claim to his land, Jack devised it to his brother, and died. Several witnesses spoke of Jack's promises to compensate Ann's services, but Elizabeth M'Garr was the only witness who proved a contract to give the *land*. Whether her testimony was direct and positive, or only inferential, I have no means of knowing, as it is not furnished; but there was a paper in evidence, (the only written evidence,) which tended strongly to contradict her. What she testified to must have been heard not later than May, 1842, for she stated that she had not been in the testator's house after that date. The paper referred to was a sealed note of Matthew Jack, dated the 17th September, 1842, acknowledging himself indebted to Miss Ann M'Kee in $288, " exclusive of former notes," and expressly stated to be " on final settlement." The judge instructed the jury that the measure of damages for the special contract, if proved, was the value of the land, and referred it to them to find whether her services were embraced in the settlement of September, 1842. They found in her favor, and gave her the value of the land in damages, which ruling the Supreme Court affirmed in an opinion delivered by Mr. Justice Rogers.

At the same term, but subsequently, *Bash* v. *Bash*, came before this court. This also was an action on a parol contract to compensate the services of a son by the gift of a specified farm. The judge had held, that evidence to establish a contract between father and son, need not be stronger than between strangers, and that if it was " clear and satisfactory," it need not be " direct and positive." Chief Justice Gibson, taking the rule as to measure of damages from Judge Rogers, in *Jack* v. *M'Kee*, without examination, proceeded to reverse the judgment, on the ground that the evidence in such cases should be direct and positive, and that there was no such proof in the case. By direct and positive proof I understand the testimony of a witness who was present when the bargain was made, and heard the parties contract, as contradistinguished from those casual allusions to it, and those testamentary purposes and intentions which witnesses often hear one of the parties express in the absence of the other. Now, besides a good deal of this latter kind of evidence, in *Bash* v. *Bash*, one witness stated that he was present when the parties, father and son, were at work on the farm, and he heard the son say: " We have more hard work than we are able to get through with." His father replied : " Don't be discouraged—you shall be paid for all the hard work you do for me—*I will leave you this place*— I hope you will live to see the day you will enjoy it." I doubt if there was any evidence in *Jack* v. *M'Kee*, more *direct and positive* than this ; and yet this, in connection with distinct admissions and corroborating circumstances, was held, by at least a

moiety of the court, as insufficient in *Bash* v. *Bash*, whilst Elizabeth M'Garr's uncorroborated and contradicted testimony was held sufficient in *Jack* v. *M'Kee.*

The plaintiff, in *Bash* v. *Bash*, was properly turned out of court, and the rule as to the measure of damages became unimportant, in the view taken of the evidence by the Chief Justice.   This was probably the reason why he took the rule from Judge Rogers without sifting it, for I have found no case in which he seems to have vindicated or justified such a rule.   Before *Jack* v. *M'Kee,* actions for breach of parol contracts had often been brought, and the damages had been regulated by the circumstances of each case, generally by the price paid or services rendered; never in a single instance, that I have found, by the value of the land. And had the mind of the Chief Justice been drawn to the subject, as the *principal* point, in *Bash* v. *Bash*, it would most certainly have recurred to the antecedent course of decision, instead of resting on the ill-supported and novel rule of Judge Rogers in *Jack* v. *M'Kee.*

Such are the two cases of 1848.   Dismissing *Bash* v. *Bash*, as containing nothing relative to the point in question, more than an unnecessary recognition of it, I recur to an examination of the doctrine, as held by Judge Rogers in *Jack* v. *M'Kee.*   He quotes the point which had been put to the court below by counsel, and which, when we come to state the authorities, will be found to contain the very mind of the law—" that the plaintiff was entitled only to such damages as would be a reasonable compensation for the services rendered ;" but he quotes it only to repudiate it, and to say, that "she was entitled to compensation according to the estimate of the parties themselves, or, in other words, to damages to the amount of the value of the land."

This opinion is said to rest on principle and authority.   For the principle the learned judge relies on a supposititious case stated by himself, in delivering the opinion of the court, in *Rohr* v. *Kindt*, 3 W. & S. 563, thus:   "Where A., in consideration that B. will perform certain services of an uncertain value, agrees to give him a horse, or a tract of land, particularly named and specified; B. performs his part of the contract, and then A. refuses to deliver the horse or convey the land.   The measure of the damages is the value of the horse or land, as the case may be, because that is the stipulated reward of the services of B., whatever may be their intrinsic value, more or less."

We have now got at the foundation of Judge Rogers's rule for the measure of damages in actions on parol contracts, and, with all respect for my learned predecessor, I propose to examine it candidly, but freely; and that my observations on it may be more intelligible, I shall classify them.

1. It appears to me that his hypothetical case was a mere

dictum, and wholly irrelevant to the case before him. He seems to have suspected this himself, from what he says about it in *Jack* v. *M'Kee.* And whoever will examine *Rohr* v. *Kindt*, will see it was an action of *covenant on a written and sealed instrument*, and that Judge Rogers reversed the judge below for saying, among other things, *that the value of the land was the measure of damages.*

2. It does not appear, from his own statement of his hypothesis, that the contract between A. and B. was a *parol* contract, and being stated in a case which was founded on a written contract, the fair presumption is, that he did not mean to state a case of parol contract, and if he did not, it was inapplicable to *Jack* v. *M'Kee*, which proceeded on nothing but a parol contract.

3. The analogy between the horse and the land is delusive. The one is personal property, which passes by delivery, and perishes with the using; the other, real estate, which grows more valuable with time, and which requires something more than delivery of possession to pass the title. From the time that Jeremiah bought the field of Hanameel, "and subscribed the evidence and sealed it, and took witnesses and weighed him the money in the balances," (Jer. xxxii., 10,) down through the whole Jewish history, through polished Greece and Rome, and among the barbarians of the North, the Goths, the Swedes, the Saxons—nay, among all nations, at all times, wherever property has been claimed and transferred in land, some solemnities have been observed more than were necessary in bargains about personalty. It has been a writing, a shoe plucked off, a clod, a turf, a staff, or some visible memorial of the transaction that was deemed necessary to solemnize a contract about land. With us, statutes prescribe deeds, seals, acknowledgments and registries, as evidence of land contracts; and an ancient statute, borrowed from England, the Statute of Frauds and Perjuries, *which is the panoply of every land-owner in Pennsylvania*, sets aside and avoids all contracts about land for more than a three years' lease, which are not reduced to writing. Now, notwithstanding all this, Judge Rogers puts a contract about land on a footing with a contract about a horse, and then refers to this incongruous conjunction as the *principle* on which the ruling in *Jack* v. *M'Kee* was grounded.

4. By the "value of the land," Judge Rogers does not mean the value at the time of the making the contract, but at the time of its breach. This is evident from the manner of applying the rule in *Jack* v. *M'Kee*, and subsequent cases. If the value at the time of making the contract were intended, the consideration paid would be, as between the parties, the measure of *that* value, and this is the very standard of damages for which I contend. But the value at time of breach is what Judge Rogers sets up as

[Malaun's Administrator *v.* Ammon et ux.]

the standard, "because that is the stipulated reward of the ser-
vices of B., whatever may be their intrinsic value more or less."
As to the expression, "certain services of uncertain value," we
must be careful that we are not cheated by sounds. It is the
constant business of juries to ascertain and assess the value of
services whose price is not fixed, and certainly not a more deli-
cate duty than to ascertain and assess the value of land.

5. Without combatting the rule of Judge Rogers in its appli-
cation to horses and other personal property, I deny it to be law
as to land, either in England, in Pennsylvania, or in most of the
States of this Union. An examination of the authorities will
establish, beyond cavil, the following propositions: That in ac-
tions on *covenants of seisin*, the measure of damages is the real
consideration paid. That mentioned in the deed is *prima facie*
evidence of the value of the land, as agreed on between the par-
ties, and of the consideration paid, but the vendee is not con-
cluded by the consideration mentioned in the deed, and may go
into parol evidence to show what it really was. And when it is
ascertained, it is sometimes called the value of the land, by
which is always meant the value at time of contract—for so it
was agreed between the parties—but that consideration, or that
value, (whichever expression is preferred,) is the measure, instead
of the value at the time of the breach. On covenants for *quiet
enjoyment and of warranty*, the measure of damages is limited
by the consideration-money and interest, and this is said by Mr.
Rawle, in his excellent work on Covenants of Title, p. 268, to
be settled law in the States of New York, New Jersey, Pennsyl-
vania, Virginia, North and South Carolina, Georgia, Kentucky,
Ohio, Arkansas, and Iowa. In New Hampshire and Indiana,
the question is said to be unsettled. In several other States, it
seems not to have been touched. In Connecticut, Vermont, and
Maine, the rule is to ascertain damages by the value of the land
at the time of the eviction; though in *Herford* v. *Wright*, Kirby,
R. 3, the leading case in Connecticut, Law, C. J., admitted the
British rule to be the consideration of the deed. In Massachu-
setts, there are authorities both ways, though the weight of them
inclines to the rule as held in Connecticut. See the cases cited
in Rawle on Covenants of Title, pp. 70–79, and 263–270. Such
is the rule where the consideration is executed; and that it is
the same where it is executory, follows, not only from the reasons
of the law, but from the doctrine of the following cases: *Fleurean*
v. *Thornhill*, 2 W. Black. 1078; *Walker* v. *Constable*, 1 Bos. &
Pul. 306; *Johnson* v. *Johnson*, 3 Bos. & Pul. 162; *Walker* v.
*Moore*, 10 Barn. & Cress. 416; *Jermain* v. *Egglestine*, 5 Carr.
& Payne, 172. On the authority of these cases, and others, Sir
Edward Sugden, in his work on Vendors, and Mr. Chitty, in his
work on Contracts, assert the rule to be, that if the purchaser

[Malaun's Administrator *v.* Ammon et ux.]

declare on the common money counts, he of course cannot obtain any damages for the loss of his bargain, and even if he affirm the agreement, by bringing an action for non-performance of it, he *will obtain nominal damages only for the loss of his bargain, because a purchaser is not entitled to any compensation for the fancied goodness of his bargain, which he may suppose he has lost, where the vendor is, without fraud, incapable of making a title.* Sugden on Vendors, 280. To the same effect, see Chitty on Contracts, p. 278, where the rule is very explicitly stated. Indemnity is the object of the action in these cases, and accordingly it was held by Tod, J., in *Seitzinger* v. *Weaver*, 1 R. 337, that the damages on an article of agreement for the sale of land, where the vendor died without making a conveyance, was the purchase-money of the land, with interest from the time of the eviction. If a purchaser take a deed without covenant, and he be evicted, he cannot recover back the purchase-money if it have been paid, though he may detain it, on the ground of failure of consideration, if it have not been paid. But, neither with nor without a covenant, can he be compensated for improvements made, or for incidental accretions in value. *Dorsey* v. *Jackman*, 1 S. & R. 42; *Staats* v. *Ten Eycke*, 3 Caines, 111; *Pitcher* v. *Livingston*, 4 Johns. 1; *Bender* v. *Fremberger*, 4 Dal. 486; *Hayden* v. *Weutzer*, 10 S. & R. 131; *Bolton* v. *Johns*, 5 Barr, 145. The exception to these rules is in cases of fraud, which are everywhere recognized as furnishing a different standard. *King* v. *Pyle*, 8 S. & R. 166; *Lee* v. *Dean*, 3 Wh. 330; 2 Wend. 399; 21 Ibid. 457. But the question before me has no such element in it; for in neither *Jack* v. *McKee*, nor its cognates, was there an allegation of fraud.

These are the settled principles of law in regard to *written* contracts, and it is apparent that Judge Rogers's hypothesis, in *Rohr* v. *Kindt*, unsupported by a single authority cited, is in direct conflict with these principles. Be it that the man who contracts for a horse and pays the price, may recover his value— the law of Pennsylvania is, as the cases cited will abundantly prove to any person who will consult them, that the man who contracts for *land* and pays the price, but loses it without fraud in the vendor, can, at most, only recover back his money and interest, or the value of his services rendered, if this was the form in which the consideration was paid.

But, perhaps, it will be said the hypothesis in *Rohr* v. *Kindt* was predicated of parol bargains. Though this does not appear yet let it be granted—what then? Do parol contracts for land rest on higher principles than written? According to the hypothesis they do, and that is enough to condemn it. Let me illustrate. A. and B. buy each a tract of land the same day—the one in consideration of certain services of uncertain value already rendered,

the other in consideration of similar services to be rendered. A. takes a deed, with nominal consideration, but with a covenant of warranty, and goes into possession, and makes valuable improvements. B. leaves his contract in parol, gets no possession, and makes no improvements. Ten years elapse, and the discovery of minerals on both tracts, and the improvement of the country, have greatly enhanced the value of both tracts; when A. has his land taken away by a paramount title, and B. fails to get his title. Both sue for damages—A. for a breach of his covenant, B. for breach of the parol agreement. We have seen that the measure of damages in A.'s case is not the value of the land at the time of eviction, *but the consideration paid,* which may be ascertained, not merely from the deed, but from evidence *dehors* the deed; "the uncertain value of the certain services" rendered, is the fact to be ascertained by a jury, and *that* value, with interest from the time of eviction, is the measure of his damages. But not so in B.'s case, according to Judge Rogers. Here the jury are to ascertain the *value of the land at the time the contract was broken,* and to give damages to its full amount. Why? "Because the land was the stipulated reward of the services." But was not the land conveyed to A. as the *stipulated reward of the same services?* Exactly. And yet, according to the principle avouched by Judge Rogers, A.'s folly in taking the titledeed is punished by his recovering, perhaps, one-tenth of the sum awarded to B., though the services rendered by A. were of equal value with B.'s, and his land lost greatly the most valuable, by reason of his improvements added.

Now, I ask, is that worthy the name of a *principle,* which, in this fairly stated case, would work such flagrant injustice, and so gross an absurdity? A bounty set on *parol* contracts for land in a State where the Statute of Frauds and Perjuries forbids them— where the Statute of Wills forbids parol disposition of real estate, where warrants and surveys, patents and deeds, are the prescribed muniments of title—where seals and witnesses and registries are enjoined! And that appealed to as a *principle!*

The plain truth is, that this so-called principle is so subversive of all received opinions—of all rights of property—so terrible an instrument of fraud and perjury—so opposed to the authorities and analogies of the law—that it cannot last. The judiciary is incompetent to make such a noxious weed grow in the soil of Pennsylvania, and under the broad light of the nineteenth century, cultivate it as they may. I predict it will not long cumber the ground. When it comes to be generally understood and *felt,* a power greater than the hands which planted or nourish it, will uproot and throw it away. Meantime, however, much individual wrong and suffering will be inflicted by it, but this must be borne. I have seen some already. For whatever more it is destined to

[Malaun's Administrator *v.* Ammon et ux.]

bring on families, before it is cast out, I do not mean to be in any manner or degree responsible.   Hence I have dissented from the majority in every instance in which they have followed (*Jack* v. *M'Kee;*) and I am happy to be able, and at liberty to add, that my brother LOWRIE, has joined me heartily in those dissents.

I come now to an examination of the *authorities* relied on by Judge Rogers, in *Jack* v. *M'Kee.*   They are *Burlingame* v. *Burlingame*, 7 Cowen, 92, and *Hopkins* v. *Lee*, 6 Wheat. 118 ; but before discussing them, I propose to state the law, with all possible brevity, as it was always held in Pennsylvania before 1848, and to cite *our own* authorities, which Judge Rogers did not trouble himself to do.   He says that Matthew Jack died " oblivious of all contract with Ann M'Kee" for his land—a fact for which we can excuse Jack's memory, when we consider that months after the alleged contract, he made a "final settlement" with Ann, which resulted in a pecuniary obligation; but the learned judge seemed equally *oblivious* of all that had been decided in Pennsylvania as to actions on parol contracts; a fact for which I am unable to account.

The statute of 29 Ch. II., though passed in 1676, was not extended to this country.   This statute, founded on the experienced fact that parol contracts about land were prolific of frauds and perjuries, is entitled an act " for prevention of frauds and perjuries," and it forbids the creation of any estate or interest in land, by parol, greater than a three years' lease.   The fourth section, among other things, provides that *no action* shall be brought on any contract or sale of lands, or any interest in or concerning them, unless the agreement or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith.

But though our ancestors did not bring this statute over with them, they did not long leave themselves destitute of its most material provisions.   Our act of 21st March, 1772, supplied several sections of the English statute ; but, by accident or design, the fourth section was omitted from our enactment, and never has been in force in Pennsylvania.   The consequence is, that with us no legislative enactment has ever forbidden an action to recover *damages* for breach of a parol contract about lands, though the policy of discouraging such contracts has always prevailed, and courts have, in every instance, before the case under review, watched the damages narrowly, that they should not amount to virtual performance of the contract.

The first case was *Bell* v. *Andrews*, 2 Dal. 152.   The action there was by the vendee, not to enforce the contract, or to give him the profit and benefit of it—this was forbidden by the statute—but to recover damages, that should restore him to his rights, as they were before the contract was made.

[Malaun's Administrator *v.* Ammon et ux.]

*Ewing* v. *Tees,* 1 Bin. 450, was an action by the vendor against the vendee, to recover the purchase-money on a written contract, signed by the defendant and the agent of the plaintiff. The agent's authority being by parol, the case was treated as an action for breach of a parol contract, and the plaintiff had a verdict, not for the amount or value of the contract, which was $6366.67, but for damages to the amount of $283.21. Tilghman, Ch. J., after taking the distinction between an action for damages, for not performing a contract, and an action to enforce it, added: " The jury may give such damages as under the circumstances of each case appear reasonable, and *these damages will often be very small,* and there is less danger of perjury, because these actions are limited, so that they must be commenced within six years." In both these cases the distinction is plainly marked, which, in our day, it has become fashionable to disregard, between damages as indemnity, and damages according to the value of the bargain.

That the understanding of the profession formerly was, that damages for the value of the land was equivalent to performance of the contract, and so within the statute, is apparent from the note in 1 Smith's Laws, p. 397. " If," says that very sensible annotator, " under the pressure of heavy damages, the party could, in such cases, be deprived of what is called the *locus pœnitentiæ,* and on the one hand be compelled to convey, or on the other to accept of the purchase, by having damages against him *to the amount of the contract,* according as the jury may view the circumstances of the case, the distinction would then be without a difference, and the absence of the fourth section of the statute of Charles, a serious inconvenience."

In *Irwin* v. *Bull,* 4 W. 287, it was decided that specific performance of an unexecuted verbal bargain for the purchase and sale of land, could not be enforced by action, and a conditional verdict in an action on such a contract for a certain sum to be released on the execution and delivery of a deed, was erroneous.

*George* v. *Bartiner,* 7 W. 531, was an action by the vendee in which the amount of damages recovered is not stated; but from the remark of the court on the subject of damages, it is evident they were not given as a penalty to enforce the contract. It was said the action was in *disaffirmance* of the contract, and for that reason was sustained.

In *Whitehead* v. *Carr,* 5 W. 368, the action was brought by two, on a contract of purchase made by one ; and Grier, P. J., ruled that the action had not been rightly brought in the name of the two plaintiffs, *and that it could not have been maintained if it had, without proof of a part execution of the contract,* and his judgment was approved in an opinion by Huston, J., who intimates considerable doubt in what cases such actions will lie.

*Clark* v. *Wilson,* 1 W. & S. 554, illustrates the law on this

subject exactly.  It was an action by a vendor to recover pur-
chase-money, and Gibson, C. J., assuming that a vendee could
not have the profits of a parol contract for land, argued from the
necessary mutuality of contracts, that the vendor could not re-
recover his purchase-money, but admitted that either might have
his action for damages for breach of the contract by the other.

If the court had understood, at that time, that the vendee's
measure of damages was the full value of the land, the Chief
Justice would most certainly have made him pay the purchase-
money, and *Clark* v. *Wilson* must have gone the other way;
for the case was put on mutuality—and if *one* might recover the
value of the contract, then, by force of the principle of mutu-
ality, the *other* might.  But because the vendee could not have
the value of the contract, the vendor should not.  Judge Rogers's
hypothesis, in *Rohr* v. *Kindt*, had not then appeared, and it is
evident that whatever shadows it may have cast before, as coming
events sometimes do, had not fallen on the mind of the late Chief
Justice.

*Ellet* v. *Paxson*, 2 W. & S. 418, was another action by the
vendor to recover damages for breach of a parol bargain, the
consideration of which was $15,000.  The plaintiff claimed da-
mages to that amount; "but," said Sergeant, J., at Nisi Prius,
"I do not agree to this.  To do this would be to subvert the Act
of Assembly.  You might as well repeal it."  The jury found a
verdict for $6500, which, when the case came before the Supreme
Court, Judge Kennedy pronounced "enormous, and altogether
unreasonable," and said that in no view of the case ought they to
have exceeded $5000.  He recognized, also, the doctrine, that
to allow the plaintiff to recover to the full amount of the value of
his contract, would be virtual execution of it, in contravention of
the statute.  In *Sedam* v. *Shaffer*, 5 W. & S. 529, the rule of
damages, as I have stated it, will be found distinctly recognized.

In accordance with this train of decisions, *Hastings* v. *Eckley*,
8 Barr, 197, was decided; and if the precise point now before
us was not passed on by the Supreme Court, it was because learned
counsel acquiesced in the ruling it received below.

I conclude this glance at the law, as it stood before *Jack* v.
*M'Kee* marred it, with the following words of Judge Rogers, in
*Haines* v. *O'Conner*, 10 W. 320 ; and I adopt them as reflecting
the very form and pressure of the law : "We must be careful to
avoid unsettling titles to real estate, upon parol proof of bargains
made a long time since, particularly where the property has great-
ly increased in value, or where it has passed into other hands.
If the court should yield to such claims, it is impossible to foresee
where the mischief will end, from the ease with which such testi-
mony can be procured, tempted as they will be by the chances of
receiving large estates on proof of such agreements.  If a parol

contract for the conveyance of land has been violated, the party
has his remedy for action, when he will recover the damages *ac-
tually* sustained." Thus it is shown, that every judgment and
judicial sentiment on record prior to 1848, is in fatal antagonism
to the ruling in *Jack* v. *M'Kee.*

Now for *Burlingame* v. *Burlingame,* 7 Cowen, 72. This was
an action on the common counts for labor and services. It appeared
in evidence that the defendant agreed with the plaintiff, (an in-
fant,) to convey him a certain piece of land, if he served the de-
fendant faithfully till 21 years of age. He worked till he was
21, and some time afterward, when he instituted this suit. Three
points of defence were taken: 1st, That plaintiff could not re-
cover for his services during minority, the compensation for those
belonging to his father. 2d, That this part of his claim being on
a special agreement, was inadmissible under the common counts.
3d, That the agreement was void by the Statute of Frauds.

The Supreme Court of New York ruled the first against the de-
fendant, and the second in his favor ;—that is, that the plaintiff
could not recover on the common counts, and this doctrine was after-
wards overruled in *King* v. *Brown,* 2 Hill, 486. As to the third
point, the learned judge stated the question in these words : " The
question, then, is presented, whether in any given case where one
has parted with his money, or rendered services, and the considera-
tion for so doing is a promise by the other party to convey land,
the party who has rendered the service or paid the money is with-
out remedy ?" After reviewing the New York authorities, he
answers this question thus : " It seems, therefore, to be clear upon
principles of law and justice, that the plaintiff may elect to con-
sider the contract as rescinded ; and if so, his right to recover
back *his money or compensation for his services* is unquestion-
able."

This is precisely the doctrine of the point put by counsel in
*Jack* v. *M'Kee,* and yet in overruling that point, Judge Rogers
cited *this* case as authority ! Did the learned judge read the
report of the case ? I think it is impossible, for after a very care-
ful analysis of it, I am prepared to say, that although no question
was raised on the measure of damages, yet so far as it goes, *Bur-
lingame* v. *Burlingame,* is an authority *in direct opposition* to the
ruling in *Jack* v. *M'Kee.* So is *King* v. *Brown.* There, Chief
Justice Nelson ruled that these contracts are void under the
statute, and then added : " The true principle is this, the con-
tract being void and incapable of enforcement in a court of law,
the party paying the money or rendering the service in pursuance
thereof may treat it as a nullity, and *recover the money or value
of the services rendered under the common counts.*" According-
ly, the judge below, who had ruled that the "*plaintiff was en-
titled to recover the value of the land at the time the defendant*

*should have conveyed,"*.was reversed.   Judge Rogers says that *King* v. *Brown*, so far from overruling *Burlingame* v. *Burlingame* in this particular, affirms the principle as to the measure of damages, which is most true ; for the two cases are coincident on *this* point, and both of them dead against the doctrine for which Judge Rogers cited them.   If I have not quoted enough from them to prove this, let any man study them for himself, and he will see I am right.   There is a striking instance of the infectious nature of error, as well as of the *diligence* of a compiler, in Sedgwick's work on the Measure of Damages, where the author, a New York lawyer, instead of examining these cases in his own State, and giving us the rule they furnish, follows Judge Rogers in grouping them with *Jack* v. *M'Kee*, and represents them as teaching the same doctrine.

The other case relied on as authority by Judge Rogers, is *Hopkins* v. *Lee*, 6 Wh. 109 ; where the Supreme Court of the United States, under the special circumstances of a very peculiar case, resting not in parol agreements, but in *written contracts,* applied the rule of that court, that in an action by the vendee for a breach of contract on the part of the vendor, for not delivering the article specified, the measure of damages is its price at the time of the breach ;  but intimated that such was not the rule in case of eviction.   To borrow the language of the printed argument of a distinguished gentleman of the bar, in *Bash* v. *Bash,* "it is sufficient to say in reference to that case, *Hopkins* v. *Lee,* that it is entitled to no weight, because it seems to have been decided without much consideration, and without any research, and is supported by no authority whatever.   It is to be remarked, however, that the court decline saying what the law would be in case of an eviction, that to be consistent, they must apply the same rule to contracts *executed,* and that on the contrary, the law is so well settled in the latter description of cases in this State, as to control, by the force of analogy, the decision in this case.   The same view of the' case is taken by the Supreme Court of New York, in 2 Wend. 399 ; where it will.be found to be overruled on the same' ground."

Such are the authorities which Judge Rogers invoked when he turned his back upon all that had been settled in England and Pennsylvania, and in most of the other States of the Union, on the subject of damages for breach of real contracts.   Never was the maxim of *stare decisis* more signally violated, and never was violation of that maxim more inadequately palliated.   Under the influence of such just sentiments as this learned judge had advanced in *Haines* v. *O'Conner,* the courts were returning to a strict construction of the Statute of Frauds and Perjuries ; and specific execution of parol contracts for lands was beginning to be denied in every case where it would not be a fraud to withhold

execution, and the owners of land in Pennsylvania seemed likely to regain the protection which that statute was designed to afford their titles; but, as soon as the doctrine in *Jack* v. *M'Kee* came to be understood, it was perceived how, under cover of compensation, this venerable rule of property could be evaded.   Instead of bringing actions of ejectment for recovery of the *land,* actions on the case for the recovery of the *value of the land,* came into fashion.

In *Peifer* v. *Landis,* 1 W. 329, Judge Rogers had held that a contract in all points similar to that in *Jack* v. *M'Kee,* was within the statute, but that was ejectment, in the nature of a bill in equity for specific execution, and therefore the statute should apply; but had the plaintiff in that case, after *Jack* v. *M'Kee* was decided, sued for damages, the full value of the land might have been recovered, notwithstanding the statute, and thus the operation of that invaluable statute was brought down to the difference which exists between a tract of land and the full value of a tract of land.   Persons were not slow in conforming their demands to this imaginary distinction—a distinction, according to Smith's note, without a difference—and accordingly we have had, in rapid succession, a series of extraordinary cases, which may fairly be regarded as fruits of *Jack* v. *M'Kee,* and which, as they are not yet reported, I proceed now to notice.

The first of them was *Oyer* v. *M'Dowell,** at Harrisburg, in June, 1853.   It was an action against the personal representative of a decedent, and the proof of contract consisted in casual declarations of the decedent, made to various persons; sometimes importing that he meant to give the plaintiff, for services rendered, a house and lot known as the "Wyand property," and sometimes ten or twelve acres of land known as the "Troutman property."   The plaintiff declared for both, and seems to have got a verdict for the value of both.   The evidence, less satisfactory to my mind than that which was repudiated in *Bash* v. *Bash,* was deemed "direct and positive" by three members of this bench, and the judgment was accordingly affirmed.   In the opinion delivered by Chief Justice Black, no additional authorities are cited, and no new views advanced in support of the ruling in *Jack* v. *M'Kee;* but there is a solemn and impressive exposition of the maxim of *stare decisis,* which it is much to be regretted was not before the mind of the court in 1848, for it might have prevented the decision that was made in *Jack* v. *M'Kee.*   That case, as I have shown, was an abrupt departure from all that had gone before it, and deserved the chastisement which, while following it, the Chief Justice administered in *Oyer* v. *M'Dowell,* to all such departures.   For myself, I take occasion to say,

* Since reported in 9 Harris, 417.

[Malaun's Administrator v. Ammon et ux.]

that when, through accident, press of business, or misconception, a decision is pronounced which subverts a fundamental rule of property, and by consequence renders every man's estate insecure—which, under color of compensating personal services, strips families of their patrimonial acres—which, in short, subjects land-titles to the changes and chances of parol evidence—the maxim of *stare decisis* bids us to go back to the old, straight, safe paths, and not to blunder again and again, because we have blundered once.

The next case in the series was *M'Clintock, Administrator of Beach*, v. *Beach*, decided at Philadelphia, in March, 1854, in which a grandson sued the administrator of his deceased grandfather for a bill of services, which, as rendered, amounted to about $1700, but was subject to various set-offs. The case was arbitrated, and on examining the principal witness for the plaintiff, his counsel conceived that he could strike higher, and accordingly discontinued that suit, and instituted another for the value of the old man's homestead and one hundred acres of land, valued at about $10,000. On the trial of this cause, the evidence consisted of the usual declarations, importing testamentary intentions in favor of the grandson, and the rule in *Jack* v. *M'Kee*, endorsed by *Oyer* v. *M'Dowell*, being, as I have occasion to know, most reluctantly applied under the pressure of authority, by the learned President of the Common Pleas, the plaintiff had a verdict for $9695. Embarrassment certainly, and possibly ruin to the grandfather's estate—disappointment and poverty to widowed daughters and their children, and confusion and distress throughout the family of Nathan Beach—are the consequences. Painful as they are, I agree that these circumstances are no reason for changing a well-considered and long-settled rule of law; but they plead powerfully against this modern and destructive innovation upon well-considered and long-settled rules. Who does not see that exact justice would have been done to young Beach by giving him the amount of his claim, lessened by his grandfather's advances? He would doubtless never have thought of more, if *Jack* v. *M'Kee* had not put mischief into his head; and thus it is that a bad precedent makes hard cases, as hard cases often make bad precedents.

I come now to the case in hand. An old maiden lady, Becky Malaun, having real and personal estate, took a young girl to bring up, who was friendless and destitute. She clothed and schooled her—gave her from time to time various articles of personal property—suffered her to marry, after which she and her husband lived in the old lady's house—the wife having control of the old lady's purse, and during the last year of her life, receiving various sums of money. After Becky's death, Mrs. Ammon claimed $300 of the personal property as her own, which

[Malaun's Administrator *v.* Ammon et ux.]

was set off to her, and then she instituted this action to recover the value of all that remained, both real and personal, on the strength of certain declarations which the old lady had been heard to make; and under the direction of the court, the jury gave the value of the property, $1843.47. Looking into the evidence, it seems to have been of about the usual stamp—expressions of affection and confidence, and indicative of testamentary intentions. The witnesses were a brother of the plaintiff, who obtained his most important revelations from this old woman, over seventy years of age, "in the evening, at supper, while we were sitting at the table, taking tea," and neighbors, who heard casual observations from time to time, as opportunity served. Some attempt was made to establish a nuncupative will for the old lady; but that failing on account of the rigor of our Statute of Wills, this action was resorted to with complete success. Garrulity is one of the privileges of old age, especially over the tea-table; but if this modern rule of law prevails, it must be denied to old people, and they must be taught that *chit-chat* has become title in Pennsylvania; though even then, if they seal their lips hermetically, they must not be sure words will not be imputed to them which will transfer all they leave to stranger-hands. If twelve men could be found, who, on the facts in this case, should not believe the plaintiff had been richly compensated for all she did for the decedent, let them give what would compensate her. That, according to my views of right and wrong, would be justice; and, according to all that was written before *Jack* v. *M'Kee*, it would be law too. But to compensate her without reference to the value of her services, and according to the value of the property promised—not as its value was when the promise was made, but when it was broken— is, in my humble opinion, opposed to law, reason, and justice.

It is worthy of remark, that *Jack* v. *M'Kee*, and each of its sequents, have been against personal representatives of decedents. Who does not know how easy it is to fabricate cases against dead men? They are not here to explain, to contradict, and to hold willing witnesses to their responsibility to the criminal law; and hence persons are never wanting to swear strongly in behalf of a living relative or friend. The prominent thought, expressed in some loose and casual conversation, may be substantially stated, though generally with high coloring; but all the conditions and qualifications which the speaker annexed to the thought, are sure to be forgotten by the witness. These inaccuracies, resulting necessarily out of the infirmities of memory, and the bias and corruptibility of witnesses, and inherent, more or less, in all parol testimony, are what render it unfit to be evidence of title or interest in land. · Hence society has provided itself with legislative guards against the manifold dangers of parol

[Malaun's Administrator *v.* Ammon et ux.]

proof in reference to lands, in the Statutes of Frauds, and of Wills. The first requires contracts about land, if more is meant than a three years' lease, to be in writing; the other, that all wills shall be written, signed, and attested by two witnesses; and although it provides, very cautiously, for nuncupative wills in respect to *personalty*, it tolerates nothing in respect to *realty* except written and attested instruments.    The legislature has provided for proof and specific execution of parol contracts of decedents, for land, *where the parties have so far in part executed them as to take them out of the Statute of Frauds and Perjuries*—a plain intimation that where they have not been in part executed, there is no remedy for them, either specific or substantial.    Now, neither in *Jack* v. *M'Kee*, nor in the cases which have followed in its wake, was there any pretence of such part execution of the contracts alleged as would take them out of the statute; and therefore it has happened that in giving damages to the full value of the contracts, and thus executing them substantially, not only all precedent judicial opinion has been contravened, but the legislative policy of the State has been violated.    In each of these cases the contract has been such as the law would not allow to be enforced—which equity, even, would not rescue from the condemnation of the statutes alluded to; and yet we are told the law will punish the breach of it, where there has been no fraud, with a measure of damages equivalent to specific performance!

The rule that requires claims to land or its equivalent value to be written, is plain, simple, reasonable, and just.    If the contract set up to take away another's inheritance will not bear to be written, that is, if the party could not be brought to the point of signature, as in the case under review, the decedent most certainly could never have been brought, then that is proof positive that such a contract was never finally settled and made; and no amount of loose and incidental talk, or looser recollections and representations of it, ought to prevail against the powerful presumption that arises from the absence of written evidence.

But the great argument in these cases has been, that nothing could make the plaintiffs whole but the value of the land; that the value of the land is the value of the services as fixed by the parties themselves, and that such parties, like all others, are to be held to their contracts.    Perhaps this argument is sufficiently answered in what has been already advanced, but I reply to it on two specific grounds.

If the contract be indeed such that the value of the land must be the measure of damages, then that proves it to be within the Statute of Frauds, and it must be set aside.    To such a contract the parties are not to be holden, any more than to promises barred by the Statute of Limitations, or to contracts made in violation of the statutes against Sabbath breaking, usury, or indict-

[Malaun's Administrator *v.* Ammon et ux.]

able crimes and misdemeanors.  Such a contract is just as much within the reason of the statute, when its fruits are sought in an action of assumpsit, as in an action of ejectment.  The operation of the statute cannot logically or fairly be made to depend on the nature of the action brought on the contract.  The statute is a rule of evidence, intended to prevent perjuries, to which contracts for land are supposed to offer peculiar temptations, and if fairly dealt by, must be so construed as to suppress that mischief.  The mischief sprung from parol proof of land contracts, and whatever the form of action, the policy of the statute was to exclude this medium of proof, "for the prevention of perjuries."  Now, it would require nice casuistry to determine how much less temptation to fraud and perjury the *value* of a tract of land would offer, than the *tract* itself.  It is the value of land that constitutes the motive to contracts, actions, and perjuries about it.  Strip land of all value, and it will not be the subject of contracts.  And land and its value are equivalents.  Every acre in Pennsylvania has its equivalent in some denominate sum of money.  Judge Rogers conjectured that Miss M'Kee would prefer Jack's land to its value in moneys numbered, because "it had been the home of her father's;" but most people are not so sentimental as Miss M'Kee, and would quite as soon have land's worth in cash, as the land itself.  The argument concedes that the contract is within the statute, when you go for the land, but denies that it is when you go for the value of the land; that is, the statute, according to the argument, was made for "prevention of perjuries" in *ejectment,* but not in actions *on the case,* though the contract sued on and to be proved in both actions is identically the same.  Such a distinction would seem like trifling with rules of property and legal principles, if judicial sanction again and again had not given it the dignity and force of law.

But, in the next place, I answer the argument by saying, that it is a gratuitous assumption, that nothing but the value of the land would make plaintiffs in these actions whole.  The law is under no obligation to make such parties whole, no more than it is to make a usurer whole: for their contracts, like his, are contraband; but, in its clemency, the law does indemnify both.  It allows a man on a usurious contract to recover his actual dues, and it gives parties to parol contracts for land, compensation for their moneys paid, or their services rendered.  This is indemnity; this makes them whole.  Would not Ann M'Kee and Mrs. Ammon have been made whole by a reasonable allowance for such services as their deceased benefactors had not already compensated?  If it be said that nothing but the value of the land promised could compensate their services, and those of the plaintiff in *Oyer* v. *M'Dowell,* will it not be admitted that in *Beach's case* he would have been made whole by a measure of damages,

that should have been limited to the *amount of his own attested account rendered against his grandfather's estate?* Was it indeed necessary that he should have a verdict for some seven or eight thousand dollars more than he claimed to be due him, in order that Judge Rogers' principle in *Rohr* v. *Kindt,* should be vindicated? That *principle* has cost the heirs of old Nathan Beach dearly. After the affirmance of the judgment, they offered the plaintiff the land for the value of which he had sued; but he declined to take it in satisfaction of his judgment, and I understand it is expected to sell at public sale, not only that land, but nearly as much more, to raise the means for making him *whole,* according to this modern rule. I state this fact on unquestionable authority, and for the purpose merely of illustrating the practical working of a legal principle, the soundness of which is extensively doubted, and which, though abundantly sanctioned by recent judicial authorities, is not according to the course of the common law, nor, as I humbly conceive, conducive to the safety and welfare of society. I insist that, in all of these cases, the actions should have been treated as in disaffirmance of the respective contracts, and indemnity is all that can legitimately come out of such actions; but if the action be not in disaffirmance, but for breach of the contract, the rule of damages cited from Sugden applies, which is decisive against damages, according to the value of the bargain. The moment you go for the profits of the contract, for the land or its equivalent in money, you affirm the contract, and demand its virtual performance, and that brings it within the Statute of Frauds.

These are the views, very imperfectly sketched, which have compelled my brother Lowrie and myself to dissent from a course of decision, which, although sanctioned by the two precedents of 1848, and supported by the learning and ability with which it is our honor to be associated, has, in effect, *placed the value of all the real estate in Pennsylvania at the mercy of parol evidence in its most unsatisfactory and dangerous form.*